## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **B.W., A MINOR, BY NEXT FRIENDS** | § | |
| **M.W. AND B.W., FORMERLY KNOWN** | § | |
| **HEREIN AS JON AISD DOE,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **Civil Action No. 1:20–cv–00750** |
| | § | **Jury Trial** |
| **AUSTIN INDEPENDENT SCHOOL** | § | |
| **DISTRICT,** | § | |
| **Defendant.** | § | |

## PLAINTIFF'S FOURTH AMENDED COMPLAINT

**NOW COMES** B.W. (hereinafter referred to as "Plaintiff," "B.W.," or "the Student") and files this his *Fourth Amended Complaint* alleging that the Austin Independent School District (hereinafter referred to as "Austin ISD," "AISD," "District," or the "School District"), violated the various rights of B.W. as more specifically pled herein. Plaintiff reserves the right to replead if new claims and issues arise upon further development of the facts, as permitted by law. In support, Plaintiff respectfully shows this tribunal the following:

## I. BRIEF INTRODUCTION TO THE CASE

1.    Over the past several years, political discourse in America has become more divisive and rancorous, unfortunately creating a "Culture War" by and between political extremes. And like any war, innocent people are oftentimes caught in the cross-fire and harmed. This is a case about one such innocent, a public high school student who became an object of derision at his school, not only amongst his peers but worse yet, amongst some teachers who, alarmingly, are in a position of authority and influence over the students—and B.W. Even worse, B.W. was stereotyped because he was Caucasian and a devout Christian. B.W.

was repeatedly called a racist and a homophobe. B.W. was even called a Nazi—particularly offensive to a young student whose Jewish heritage involves family members who were killed during the Holocaust. In fact, someone put together a *meme* of B.W. wearing a Klu Klux Klan Hood and another *meme* depicting B.W.'s head on the face of a Nazi Officer. B.W.'s computer equipment was destroyed. He could not safely use a bathroom at school. He was physically and repeatedly accosted. But there is more to this student's story-much more.

2.      These egregious harms to B.W. were avoidable. B.W. and his parents complained to school officials and employees at both his Middle School and later at his High School multiple times and on multiple occasions that B.W. was a victim of bullying and harassment because of his political beliefs, his race, and his religion, and the stereotypes associated. B.W. and his parents explained that the derision came not only from students but from staff. Yet despite such notice, the school Administrators failed to respond reasonably under the circumstances of B.W.'s complaints. To the extent a Principal or other School District Official did anything at all, their response effectively amounted to no response at all, making B.W. more vulnerable to the very bullying and harassment he initially complained of. Because of Defendant's flaccid response, in addition to the systemic bullying and harassment of B.W., he then became a victim of retaliation because he and his parents had the audacity to complain of his mistreatment. After repeated complaints, while B.W. was in high school, B.W. was physically assaulted by one student while in class and another student threatened to kill B.W. After promptly being notified, neither incident initiated any semblance of a reasonable response by Defendants.

3.     As such and as will be fully described below, Plaintiff now brings forth claims pursuant to Title VI of the Civil Rights Acts of 1964, 42 U.S.C. §2000 *et seq.*, and the First and Fourteenth Amendments to the United States Constitution which may be remedied by 42 U.S.C. Section 1983. Additionally, B.W. brings forth state law claims pursuant to the Texas Constitution and Chapters 106 and 110 of the Texas Civil Practices & Remedies Code.

## II.   <u>JURISDICTION</u>

4.     This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of B.W.'s rights as secured by the U.S. Constitution and federal law. Jurisdiction is also conferred upon this Court pursuant to 28 U.S.C.A. §1331 and §1343 because the matters in controversy arise under the laws and rules of the United States as noted above. Additionally, this Court has the authority to award attorneys' fees and costs under 42 U.S.C. § 1988.

5.     This Court also has supplemental jurisdiction over various state and common law claims pursuant to 28 U.S.C. §1367.

## III.   <u>VENUE</u>

6.     Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiff's claims occurred in the Western District of Texas and in the Austin Division.

## IV.   <u>PARTIES</u>

7.     B.W. lives in Texas with his parents within the AISD catchment area. At all times pertinent to this case, B.W. was a student at the Austin Independent School District.

8.     The Austin Independent School District is a school district organized under the laws of the

Fourth Amended Complaint

State of Texas. Pursuant to state law, the citizenry in the AISD catchment area have the authority to elect individual citizen representatives to the School Board. The School Board promulgates policies and procedures to address many public concerns using a relevant grievance procedure, including and especially concerning the bullying and harassment of students. The School Board has also developed particularized policies and procedures and a complaint process to assure that students are not bullied and harassed because of their membership in a protected class, whether it be by disability as contemplated by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794; or because of sex, gender or gender stereotypes as contemplated by Title IX of the Educational Acts of 1972, 29 U.S. §1681-16-88; or by race, nationality, country of origin or stereotypes related thereto, as contemplated by Title VI of the Civil Rights Acts of 1964. The School Board has also developed policies and procedures to assure that each student has a right to express their political views, and discuss issues of faith without fear of retaliation, as contemplated by the applicable amendment to the United States Constitution.

9.     The Austin ISD has been served by and through its then Superintendent, Dr. Paul Cruz, at 1111 W. Sixth St., Austin, Texas, 78703. They have answered by and through their Counsel, the Honorable Mr. Christopher B. Gilbert, Attorney & Counselor At Law with the Law Firm of Thompson & Horton LLP, 3200 Southwest Freeway, Suite 2000, Houston, Texas 77027.

## V.   STATEMENT OF FACTS

### A.     A BRIEF HISTORY OF TITLE VI OF THE CIVIL RIGHTS ACTS OF 1964

10.    Title VI of the Civil Rights Act of 1964 provides that no person in the United States shall,

on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. §2000d.[1]

11.     The Department of Justice was given authority to develop regulations on the topic. For instance, after public hearing it promulgated the *Non-discrimination in Federally Assisted Programs-Implementation of Title VI of the Civil Rights Act of 1964* noting that discrimination is prohibited by recipients of federal funds, like the Austin Independent School District. Specifically, such recipients must not use race or nationality as a factor in denying a service or benefit[2]; or subject a person to separate treatment, or restricting[3] a student from enjoying an advantage or opportunity[4] given to another student based upon race or nationality. *See* 28 C.F.R. §42.104.

12.     Moreover, the District must provide assurances to students that the District is in compliance with federal laws by making information public about these regulations. These assurances include but are not limited to information about the School District's complaint process and the name of the person designated by the School Board to address concerns of discrimination based upon race. *See* 28 C.F.R. §42.106(d); §42.107; *see also* 34 C.F.R. § 100.4 [the United States Department of Education, by and through its *Office of Civil Rights*, has been given authority to investigate allegations of discrimination based upon race and

---

1. It is uncontroverted that the School District receives federal monies and must follow the requisites of Title VI.
2. *See also* 34 C.F.R. §100.3(b)(1)(iii).
3. *See also* 34 C.F.R. §100.3(b)(1)(iv).
4. *See also* 34 C.F.R. §100.3(b)(1)(vi).

Fourth Amended Complaint

allegations of violations of Title VI][5].

13.    Importantly, 28 C.F.R. Subpart F [*Coordination Of Enforcement of Nondiscrimination in Federally Assisted Programs*] reiterates much of what is addressed above. It requires the School District to provide information to students about Title VI throughout the school environment, whether it be in posters, student handbooks, manuals, pamphlets, websites and other material specific information about filing complaints. 28 C.F.R.§  42.405 [Public Dissemination Of Title VI Information]; *see also* 34 C.F.R.§  100.6(d) [Information To Beneficiaries And Participants].

14.    In 1994 the, United States Department of Education ("DOE") *Office of Civil Rights* ("OCR") produced policy guidance entitled *Racial Incidents and Harassment Against Students,* 59 Fed. Reg 47 (March 10, 1994). It set the professional standards of care for addressing harassment when based upon race. The number one item was to create a campus environment by first, training staff and by providing related supervision, so that they and the entire educational community become sensitive to related concerns regarding bullying and harassment. Among other things it noted the importance of publicizing the issue, of non-toleration of harassment based upon race, training to students, of counseling to both the victim and perpetrator, of ongoing monitoring and follow up on incidents, and ongoing assessment of the school climate and policies and practices to assure effectiveness.

15.    Moreover, the guidance reiterated the importance of assuring the parents receive notice of all of their procedural safeguards, including notice of who the Title VI Coordinator is and

---

5. *See* 59 Fed. Reg. (No 47) March 10, 1994 [Racial Incident And Harassment Against Students]; 68 Fed. Reg. (No. 219) 68050, November 13, 2000.

the grievance procedures available, including those at the school level, state level, and federal level. In addition, the District is required to explain to the family the investigatory process, notice of who is the correct staff person to address their concerns, information about the District's duty to complete an investigation in a timely and complete manner, giving copies of all investigatory findings to the parent, and the right to appeal.

16.     Importantly and in addition to all the above, the District has a duty to remedy the effects of any bullying and harassment a student experiences, with a response tailored to the individual needs of the student and situation. The guidance includes, but is not limited to, psychological testing and services, providing or paying for counseling services for the student, referral for medical and other community-based services, placing the students in different classes or environments, and even removing the perpetrator from the hostile environment completely. In addition, a District may provide a one-to-one aide, social skills services, self-advocacy training, and close monitoring of the victim. These professional guidelines and standards of care have been reiterated and reissued numerous times by and through the OCR in directives entitled a "*Dear Colleague Letter.*"

## B.      TEXAS LAW AND PROFESSIONAL STANDARDS OF CARE

17.     Over the course of time the Austin Independent School Board was provided significant information from the *Texas Association Of School Boards* ("TASB") on how to best respond to assaults, bullying and harassment, whenever it occurred and for whatever reason. In fact, in September of 2008, TASB disseminated a memorandum entitled *Harassment And Bullying Policies In Public Schools,* noting the requirement for schools to have an active policy and practice regarding both teacher upon student and "student-to-

Fourth Amended Complaint

student harassment," especially when based upon the student being a member of a protected class, whether the protected class is a disability, sex or gender stereotypes or race and their stereotypes. The memorandum also noted the most recent applicable legislative changes, and among other things, noting that a school district could be liable when there is student upon student harassment and the district's "deliberate indifference causes students to undergo harassment or makes them vulnerable to it, and the harassment takes place in a context subject to the school district's control."

18.     In regard to addressing issues of assault, bullying, and harassment, Texas school districts are to look to the U.S. Department of Education Office of Civil Rights, *Protecting Students From Harassment And Hate Crimes: A Guide For Schools*. In addition, the TASB also helped the School Board of the Austin ISD in developing a number of very specific policies, procedures and practices related to bullying, harassment and assault, not just for members of the general student population but specifically for members of a protected class.

19.     In 2011, the Texas Legislature again addressed bullying, harassment, and sexual harassment in the public schools by passing comprehensive and far-reaching legislation on the topic. Placed into the Texas Education Code, staff is required to undergo specialized training on this topic (Section 21.451) and students are to be provided various types of assistance including counseling.

20.     In response to all the above, in 2012 TASB again provided Texas school districts with guidance on addressing allegations of bullying and harassment in general and for members of a protected class. It promulgated updated versions of Policies and Procedures that a

School Board like the Austin ISD could adopt to address bullying and harassment, whether student upon student, teacher upon student, or both. The bulletin sent out to all Texas School Districts reiterated their duties to have a functional policy and procedure for giving parents notice of their procedural safeguards and rights, and reporting, investigating and issuing a determination regarding an allegation of bullying and harassment. It also reiterated the duty to train not only staff but students on issues regarding bullying and harassment. It reiterated School District liability under operative caselaw, like Gebser v. Lago Vista Indep. School Dist., 524 U.S. 274, 291, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998) and Davis v. Monroe County Board Of Ed., 526 U.S. 629 (1999), and, importantly, reliance upon and the significance of U.S. Department of Education, *Office of Civil Rights* Guidelines.

## C.     AUSTIN ISD SCHOOL BOARD POLICIES AND PROCEDURES

21.     The Austin ISD School Board has long had, and has re-authorized, policies and procedures related to *Student Welfare* and keeping students free from *Discrimination, Harassment & Retaliation* (FFH Local) which address, among other things, bullying, harassment, and assault. In particular, it sets out definitions of discrimination and harassment based upon race and nationality. Importantly, it has a section dealing with the duty to not retaliate against anyone because a complaint has been filed on their behalf. It provides information about the reporting and investigatory process. It requires allegations of harassment based on race and nationality to be directed to the School District's Superintendent, and the family be given that person's contact information.

22.     The family is also required to receive actual notice of their procedural rights. Once a

complaint or report is made, a school district's investigation must be completed in a timely manner, usually less than 10 days, and then a written report should be developed and interim action taken, as appropriate. The report must address whether or not prohibited contact occurred and must be filed with the relevant School District Official. If a student is not classified with the outcome of the investigation, the student has the right to appeal the decision through the district's grievance procedure or even with the Office of Civil Rights with the U.S. Department of Education (FFH Local).

23.     The Policies also note a non-exhaustive list of potential corrective actions. They include, for example, a training program for those involved in the complaint, counseling for the victim and counseling even for the perpetrator. The policies also require that a system be in place to follow up with the victim to assess the effectiveness of any intervention that may have been provided. Additionally, there should also be, where warranted, a comprehensive education program for the school community. The district should also address increasing staff monitoring. Overall, the aim is to have a supportive and safe school environment that every child can enjoy, free from fear. (*see* FFH Local).

24.     The School Board has also developed a Policy and Procedure and related guidelines on protecting political speech and religion. (*see* FNA Legal, FNA Local, and GA Legal). They do not address any specific complaint procedure but are rather included in FFH (Regulation) regarding Student Welfare-Freedom From Discrimination, Harassment and Retaliation. The School Superintendent is the position and person identified to receive and process complaints based upon bullying and harassment based upon political free speech or religion.

25.   Importantly, the School Board has developed a list of required professional development subjects for staff. (*see* DMA LEGAL). There is nothing on that list that requires staff to take any particular training on dealing with cultural sensitivity issues as race, religion or political free speech either. There is no specific training provided on what is termed "implicit bias" or "unconscious bias" or stereotyping a member of particular race or nationality.

### D.   ABOUT B.W.

26.   B.W. was born in 2003. He is now 17 years old. He and his family are Caucasian, devout Christians, and Republicans. He is named after a friend of the family who is African-American, whom B.W. is very close with. B.W.'s first crush was on a girl from Iraq. One of his best friend's family include illegal aliens from Mexico. B.W.'s Paternal Great-Grandfather was Jewish and was killed in the Holocaust. B.W. has numerous Jewish aunts, uncles and cousins. B.W.'s family is in the arts and have friends who are gay. Simply, neither B.W. or his family are bigots, racist, or judge people on their color, nationality, legal status, or sexual identity. And perhaps the most shocking point of B.W.'s ordeal is that, due to the nature of the allegations made against B.W., is that B.W. has to even defend himself using these real-life examples.

27.   B.W. is a bright young man that is incredibly respectable, kind and loving. He excels academically. B.W. has no disciplinary record. For the early part of his middle school experience, B.W. also had many, many friends.

### E.   THE MIDDLE SCHOOL YEARS

28.   On or about October 13, 2017, B.W. and his classmates attended a field trip to Enchanted

Fourth Amended Complaint

Rock. He wore his MAGA (*Make America Great Again*) hat. Almost immediately B.W. perceived an attitudinal change by staff and other students from friendly and inviting to cold and hostile. Soon he experienced this "chill" in class and in the halls.

29. A few days later B.W.'s father was attending the school's career day when he was approached by the middle school counselor. During a casual conversation, B.W.'s father mentioned that several teachers and students had been treating B.W. poorly since he wore the MAGA hat. The counselor replied "Well, you have to admit, that (hat) could be seen as pretty inflammatory." B.W.'s father then replied "To whom?" The counselor did not respond.

30. About a month later, around November 2017, and after a number of other incidents of concern, B.W.'s parents met with Principal Malott to address concerns that B.W. was becoming an object of derision because of his political beliefs.

31. B.W.'s parents suggested an assembly and bulletin board addressing the importance of *diversity of thought*, to cultivate respect for those who hold a different, or even an opposing view.

32. Principal Malott assured B.W.'s parents that an action plan was forthcoming. But after several weeks, no plan was provided by Principal Malott. Not surprisingly, things worsened. There was an increase in verbal attacks, vitriol, hatred and overall disgust aimed toward B.W. on almost a daily basis and always because of his political allegiance to President Trump.

33. After Winter Break and around January 8, 2018, B.W.'s parents met with Principal Malott again to express concerns about their son's safety, and Principal Malott's failure to respond

with an action plan like she promised.

34.   Malott again asked for some assistance and the parents sent a link to "Prager U, Real Clear Politics and Campus Reform," but after several weeks of silence, the Principal again failed to do anything.

35.   So again not surprisingly, things got only worse for B.W.. On February 23, 2018, O'Henry Middle School students staged a student walk-out, protesting gun violence. B.W.'s parents had directed him to never leave or "skip" class, so B.W. remained in the classroom while the other students walked out.

36.   Upon the protesting students return, one student said to B.W. "I'm gonna make you an 'I heart school shootings t-shirt'." B.W. received backlash and push back for remaining silent and stationary, not participating in a political protest.

37.   A few days after the middle school walk-out, B.W.'s father again spoke with Principal Malott about his concerns and again suggested she adopt a program supporting *diversity of thought* but she did not.

38.   Over the course of the Spring 2018 semester, things worsened for B.W.. He noticed that former friends stopped engaging in conversation with him, and the "Hellos" and "Hey B.W.'s!" were now fewer and further between. Rumors started going around. B.W. was not only ostracized for being a Republican, but a broader stereotype about being a Trump supporter, Caucasian, and a Christian began to emerge. For example, he was soon harassed for being a racist, and anti-feminist and anti-gay when he and his family are absolutely not.

39.   On or about December 13 2018, one of B.W.'s best friend told B.W. that he had heard rumors that B.W. was a "homophobe" (which B.W. is not).

Fourth Amended Complaint

40.     In Latin Class that semester, a student made fun of B.W. for being a Christian, saying "Ah, Christians should understand Latin."

41.     In band class, two students repeatedly harassed B.W. for being Caucasian by repeating the evils of the white race in American history.

42.     And Principal Malott participated in this stereotypical think as well. Specifically, she saw B.W. listening to music with his ear buds in and walked up to him, yanked one ear bud out of his ear and stated sarcastically, "Are you listening to Dixie?" Malott walked away, laughing to herself. Other students heard this also. B.W. was humiliated.

43.     Principal Malott's comments seemed to give other students a free hall pass to harass B.W. without fear of retribution. B.W. experienced more and more random derogatory comments from students and even some teachers after this comment by Principal Malott.

44.     For example, a teacher, Ms. Morgan walked up to B.W. one day and stated very loudly "Man, I'm getting concerned about how many white people there are." This comment was unprovoked (in addition to being extremely offensive).

45.     While walking in the halls later that semester, a student randomly walked up to B.W., pointed at his cross around his neck and stated loudly, "I don't like that your forcing your religion on me."

46.     An Aide in Math, Ms. Cathey repeatedly called B.W. "Whitey" or when he raised his hand said, "You need help Whitey?" or "Can't figure this one out Whitey?"

47.     April of 2018 proved to be one of the most difficult times of B.W.'s middle school career. B.W., who had always been a good eater, started to come home with his lunch untouched. B.W. would not sleep or get much sleep at night and was tired during the day. Always an

excellent student, B.W. failed the STARR Test.

48.     One day, B.W. came home crying from school. B.W.'s parents learned that approximately one week prior, B.W.'s former good friend and then-student council president, D.K., had created a *meme* of B.W. as a hooded Ku Klux Klansman.

49.     D.K. admitted to the school that he made the KKK meme about B.W. because D.K.'s father told him not be friends with anyone who was a Conservative.

50.     Principal Malott knew about this incident but did not refer the incident to the District's Title VI Coordinator as required, or even correctly investigate it herself.

51.     B.W.'s father complained to Malott but she did not respond. As far as the family knows, D.K. never received any consequences. D.J. a then friend of both B.W. and D.K. turned on him.

52.     On or about April 17, 2018, B.W. and his classmates had a school science field trip to Ft. Davis. Luke Borders, a teacher was very hostile toward B.W. for the entire trip.

53.     On or about April 26, 2018, B.W.'s parents wrote a letter to Principal Malott and copied Associate Superintendent of Middle Schools, Dr. Terrence Eaton, listing the problems B.W. had been experiencing, their concerns, referencing their repeated complaints, noting the lack of responses and follow-up, and letting the officials know that things were steadily worsening for B.W..

54.     On or about May 11, 2018, B.W.'s parents met with Dr. Eaton for one hour where again, B.W.'s parents retold Dr. Eaton what had been happening to their son over the course of two years at this point and that nothing had been done.

55.     B.W.'s parents later discovered that Dr. Eaton also failed to address these concerns to the

School District's Superintendent for constitutional and Title VI violations.

56. There were no apparent consequences for anyone at O'Henry. No student, no staff member, or anyone else was disciplined for the way B.W. had been mistreated, simply because B.W. held a different political belief than other students and apparently met the harasser's stereotypical prejudices.

57. May 30, 2018 was graduation day for O'Henry Middle School students. Many students wore items and even hats with their own social messages, in addition to the typical graduation attire.

58. At one point B.W. put on his MAGA hat when getting his diploma. The same teacher who had derided B.W. on the science field trip, Luke Borders, did so again, meanly saying to B.W.: "Ya know, we're trying to create a safe environment here!"

59. B.W. did not remove his hat and walked across the stage to accept his diploma like the rest of his peers. Yet the person who had bullied B.W. the most, D.K., who had also placed the racist *meme* of B.W., was Class President and stated during his commencement speech that "There had been no bullying" under his term.

60. B.W. saw and heard Borders encouraging other students, obviously those sharing his own political and social beliefs.

61. B.W.'s parents emailed Dr. Eaton complaining about D.K. and Mr. Borders.

62. On or about June 28, B.W. and his parents finally were able to have a follow up meeting with Dr. Eaton, who admitted that the District had not followed the Title VI disciplinary action/documentation in B.W.'s case.

63. The only response B.W. received after this was a letter from Principal Malott where she

says, " an apology is extended for all uncomfortable and negative experiences B.W. felt."

64.  While B.W. appreciated the summer apology letter from Principal Malott, there were still again, no actions taken to address past concerns.

65.  The family then got ready for a new beginning in high school. But hopes for a fresh start were soon dampened. Things got worse.

### F.    B.W.'S FRESHMAN YEAR AT AUSTIN HIGH SCHOOL

#### The Fall of 2018

66.  B.W. was a freshman for the Fall of 2018. B.W. was ready to start a new school year, in a new school, with new friends and memories to be made. But such optimism soon turned dark for B.W..

67.  B.W. and D.K. (the KKK *meme* artist) were placed in the same debate class. Around September 7, 2018, DK approached B.W. and referencing the past middle school incident, stated, "You're dumber than I thought, the *meme* of you was a Nazi officer, not a Klansman."

68.  A few days later B.W. files for and is granted a *Stay Away Agreement* between himself and D.K. The *Stay Away Agreement* was intended to last the entire school year.

69.  But the Stay Away Agreement soon proved worthless. D.K. and his friends continued to harass B.W.

70.  On September 21, 2018, B.W. and his parents file a grievance (the Grievance) with the School Board. Among other things, they mention that the many previous complaints made were never investigated.

71.  Even after filing the Grievance, D.K. and friends continue to verbally harass B.W. during

Fourth Amended Complaint

lunch time and even before school, in direct violation of the *Stay Away Agreement*.

72.     One day D.K. approached B.W. in front of a group of students and stated, "So you really said that? Gay people don't exist?" even though B.W. not only did not make this statement but has no such belief.

73.     On September 25, 2018 another incident occurred with D.K.. Staff then met with D.K. and his parents, but as far as B.W. could tell, nothing had actually changed for the better and it seemed to B.W. that D.K. was angrier than before.

74.     The hostile educational environment continued and worsened. A few days after September 25, B.W. was insulted in the school hallway for wearing a Ted Cruz shirt. He was also kicked by other students.

75.     In October 2018, during debate class B.W. noted to the teacher that if the classroom would have a poster of Ruth Bader Ginsburg, there should also be one of a Conservative Supreme Court Justice.

76.     B.W.'s birthday is October 30th. The MAPS class teacher, Mr. Mathney, came into class that day, loudly stating "Woke up this morning to see all the stupid things Trump had done!"

77.     During another debate class, Ms. Cooney, the teacher, loudly stated, "Trump is running our democracy and he is a liar."

78.     In ELA class, Mr. Meadows assigned a paper on "What Matters to Us." A proud Texan, B.W. asked if he could do a paper on the history of the Second Amendment and firearms. The entire class then joins in chanting "School Shooter! School Shooter!" against B.W.. Mr. Meadows remained silent and did not stop the attacks on B.W..

Fourth Amended Complaint

79.     A few days later, after Halloween in 2018, Mr. Meadows asked his class if anyone had Halloween candy. B.W. raised his hand and offered some to his teacher. Amazingly, Mr. Meadows stated to B.W. and in front of the entire class that "Your candy would be filled with hate and oppression."

80.     Finally, two months after B.W. and his family filed a Grievance, a Level I Conference is convened. At that time the family also presents the other incidents that had occurred in the interim, since the first filing. The High School Assistant Principal, Steven Maddox, is then assigned to investigate parental concerns.

81.     A few days after the family's Grievance meeting, D.K. purposefully bumps into B.W. and says, "I don't deserve what's happening to me."

82.     The retaliation soon started after the Grievance, with D.K.'s friends approaching B.W. and asking him "Why he's a homophobe?" and "Why he's a racist?"

83.     In late November 2018, one student ("P") walked up to B.W. and mockingly asked "Why are you a racist?" Later that day "P" confronted B.W. again stating that B.W. is a "Fucking racist" in front of numerous other students.

84.     On November 30, 2018 the District provides its Level I Response.

85.     On December 7, 2018 Mr. Maddox provides a written response. In regard to complaints about teacher bias and harassment he determines there was none. In regard to D.K. he confirms that he bullied B.W. as contemplated by District policy and procedures. Mr. Maddox spoke with D.K's parents and had both sign another Say Away Agreement.

86.     On December 16, 2018, B.W. and his family appeal the Level I findings.

87.     At some point later in the semester, during a MAPS class, a substitute teacher, Ms. Mauser,

Fourth Amended Complaint

overhears a conversation between B.W. and some friends involving a girlfriend. Ms. Mauser at one point told B.W., "I will not have a white man talk to me about gender issues!"

88. Another time later in the semester, during a home room period, the Pledge of Allegiance came on over the loud speaker. B.W. was the only student that stood for the Pledge. One student then told B.W., "America is only for white people."

The Spring Semester of 2019

89. After 2018's winter break, B.W. returns to school. During a discussion in class, where B.W. expresses his political opinion, a substitute teacher, Kara Mosher, said "When you are old enough to think for yourselves, you will no longer be a conservative." She abruptly cut off the conversation and told B.W. to go outside in the cold. She would verbally harasses B.W. in front of his classmates because of his political support for Republican Ideology in general.

90. On January 22, 2019, B.W. and his family file another Grievance (Second Grievance). This time, they very specifically point out that B.W. has a constitutional right to political free speech, which was being chilled by the ongoing bullying and harassment by persons like D.K., D.K.'s friends, and a number of teachers. Their complaint further asserts that B.W. and his family have been through numerous conferences with School Officials, Staff and Administrators, but with no resolution to the bullying and harassment. The Second Grievance has an addendum that specifically notes the violations of B.W.'s Constitutional Rights, the 1st and 14th Amendments, the Equal Protection and Due Process Clauses and Sex Discrimination pursuant to Title IX. Yet, like previous Administrators, the High

School does not forward this Second Grievance to the School District Superintendent or the Title VI Coordinator, even though this complaint explicitly makes claims that fall under each's ambit.

91.  Not surprisingly, the verbal bullying and harassment of B.W. continues. It is now not only daily, but multiple times per day. B.W. is harassed in class, in the halls, in the cafeteria, in gym, in the locker room, and in public areas across campus. B.W. cannot go a day without being targeted.

92.  On or about February 5, 2019, B.W. is helping a fellow student with his math work. B.W.'s computer has Trump stickers on the casing. Another student, I.L., started tracing a swastika on the student's back and then walked to B.W. and stated, "I'm going to beat the shit out of you" —and the next thing B.W. remembers is being on the ground, bleeding. B.W. does not remember how many times he was struck but he knows it was repeated. He remembers having to check his mouth to check to see if he lost any teeth because he was punched so many times. I.L. was in the same class as where the teacher said "Your candy will be filled with hatred and oppression." Another student "A" who also harassed B.W. for wearing a MAGA hat was also in that class.

93.  The next day the family met with the AISD Police. The family complained again, outlining instances of bullying and harassment previously complained about. But again, no action was taken. After the assault, B.W. became fearful of using the regular hallway bathrooms. The family asked for a safety plan for B.W., but none was given. They also filed an Additional Grievance with Amy Taylor, Principal of Austin High School.

94.  The Additional Grievance relayed the assault from a I.L. comments from teachers (like Mr.

Fourth Amended Complaint

Meadows's statement that B.W.'s Halloween candy being "filled with hatred and oppression" and noting that I.L., the student who assaulted B.W., was also in Mr. Meadows's class.) The family also reported that B.W.'s computer equipment was destroyed. Further, the parents let the school know that they had complained to the Principal or Assistant principal about the so-called "safety plan" plan between D.K. and B.W. at least three times in middle school and at least four times in high school because it had absolutely failed.

95.    B.W.'s story keeps repeating. Like Austin School Administrators before her, Principal Taylor also fails to follow School Board Policies and Procedures and does not forward the complaint to the School District Superintendent or the Title VI Coordinator.

96.    B.W. found out that I.L. told others that I.L. assaulted B.W. because B.W. was white. Also, B.W. heard that IL's friends were also "out to get him [B.W.]."

97.    Fearing for his safety and stressed with the recent events, B.W. made the decision to stay home for a few days.

98.    Around February 22, 2019, Assistant Principal Maddox completed an investigation and remarkably finds that B.W. was not a victim of bullying or harassment at the hands of I.L., even though I.L.'s statements and physical assault show otherwise. B.W. and his parents were assured by Assistant Principal Maddox that I.L.'s class schedule would be changed so that B.W. would not have to attend the same class as I.L. Sadly, that turned out to be false.

99.    On February 25 2019, Principal Taylor sent a letter to B.W.'s family discussing her investigation of the latest Level I Grievance. The District agreed to permit B.W. to use a

Fourth Amended Complaint

safe bathroom, leave class if he felt unsafe, and referred B.W. to a school counselor. The letter said that B.W.'s teachers were given notice of the grievance and the resultant plan. In the letter the District remains supportive, at least on paper, of B.W.'s right to express his political beliefs.

100. On or about March 1, 2019, B.W.'s Mother sent an email to Assistant Principal Mattox and Principal Taylor sharing with them her concerns that students expressing Conservative and Republican political opinions were being targeted in many school's across the country. B.W.'s Mother wanted the officials to know and be on notice that concerns and incidents, like what was happening to B.W., was making the news around various parts of the country.

101. In early March of 2019, B.W. brought a Justice Scalia poster to debate class. The teacher, Ms. Cooney was visibly irritated and yelled at B.W. and even stated "You're pissing me off!" in front of the entire class. Cooney had never treated any other student this poorly.

102. Over the course of the remaining 2019 semester, B.W. reports that other students called him a racist daily, he was "flicked off" daily, and also cussed at daily. Much of the time it was in front of a teacher, but no teacher ever intervened.

103. On June 6, 2019, with the semester finally over, the family filed a Level III Appeal.

104. On August 2, 2019, the family received a letter setting the Level III Appeal for September 16, 2019.

### G.     B.W.'S SOPHOMORE YEAR AT AUSTIN HIGH SCHOOL

The Fall of 2019

105. B.W. was a sophomore starting in the Fall of 2019. In early September B.W. went to Ms. Cooney's room to pick up his Scalia poster but it was gone.

Fourth Amended Complaint

106.   On September 16th, the School Board convened to hear the family's Level III Grievance Appeal. At that Board Meeting, B.W.'s Representative, Mr. Terry Gorman, repeated the plentiful bullying and harassment that B.W. had experienced not only at Austin High but also while he was in middle school. It was also reported to the Board, in broad form, the many email, telephonic and in-person complaints made to the School Assistant Principals, Principals, and District Representatives over many years. It was also reiterated that the District had done virtually nothing to help B.W., and the little that had been done actually made the treatment of B.W. worse, as B.W. subject to not only ongoing harassment, but also retaliation.

107.   The attorney for the District said in front of the School Board Members, District Staff, B.W. and his parents, that B.W.'s parents were "bad" and not serving B.W. well because they refused to accept the District's findings and continued the grievance procedure.

108.   Mr. Gorman warned the School Board if they did not send a strong message to the Austin High School Community, students, and staff, that B.W.'s treatment would get worse.

109.   The School Board members ratified all the previous findings by District staff.

110.   Not surprisingly, and as Mr. Gorman warned, B.W.'s treatment did not get better. In fact, it seemed to become worse.

111.   During the Fall 2019 semester B.W. was called a racist daily, even by other students he did not know and did not previously interact with. He got "flicked off" and cussed at daily. D.K. and his friends, further emboldened, continued to harass and intimidate B.W.. So did I.L.'s friends, who would purposefully and closely cross B.W.'s path, trying to trip him. A student told B.W., "if you support Trump you must be stupid."

112.    In early November of 2019, B.W. was an aide in the attendance office where Brenda Lindsay saw B.W.'s Trump/Pence sticker on his new computer and she berated him.

113.    In B.W.'s English Class, his teacher Ms. Palmer, allowed the students listen to music. Ms. Palmer at one point asked B.W., in front of everyone, if he "enjoyed his White Gospel Music."

114.    While in the locker room after Cross Country running practice in the Fall of 2019, a number of African American students came in and said "here are all the white boys!"

115.    B.W. complained on occasion but by then felt it was futile to do so.

                                   The Spring of 2020

116.    After Winter Break of 2019, the harassment and derision continued.

117.    On or about March 12, 2020, B.W. received a death threat.

118.    During lunchtime, B.W. was standing and taking with his few friends at school. A girl standing in the group next to B.W.'s group turned to B.W. and said very loudly, "Oh my Fucking God, I'm going to kill all Trump supporters, I don't give a shit who hears it. I want to kill all of them." When the student said this, she was looking directly and only looking at B.W..

119.    The very next day, COVID-19 caused the shut-down of all AISD schools, along with schools across the nation.

120.    Around May 21, 2020, Officer Vasquez with the AISD Police contacted B.W.'s parents to inform them that after their investigation of the death threat, they would not be taking any criminal action because "it was determined that [the student that made the threat] did not have the means to kill all Trump supporters."

121.    Even though the criminal investigation was over, pursuant to School Board Policies and
        Procedures the School District Superintendent had a duty to initiate his own investigation,
        according to relevant policy on the issue. He did not.

122.    On May 31, 2020 another Level II Hearing Final Decision was filed for the recent death
        threat. The previous decision was unfortunately upheld.

123.    On June 6, 2020, a Level III Appeal was filed incorporating all of B.W.'s previous
        complaints.

### H.    THE FALL OF 2020 TO SPRING OF 2021 SCHOOL YEAR

124.    B.W. never went back in person to the high school.

125.    B.W. has been home-schooled this past school year.

### I.    THE SCHOOL DISTRICT VIOLATED B.W.'S RIGHTS AS FOLLOWS:

126.    Whether it be pursuant to applicable jurisprudence, regulations, executive agency
        directives, Texas law, professional standards of care, and their own School Board Policies
        and Procedures, the Austin Independent School District violated the rights of B.W. and by
        extension his father and mother, in the following manners and particulars, whether it be as
        to Title VI, the United States Constitution, state law or all. The School District Officials
        failed to provide B.W. or the family in *timely* (emphasis added) manner:

        a.    notice of their procedural rights, as set forth by the regulations promulgated under
              Title VI;

        b.    information about who the Title VI Coordinator was for the District;

        c.    information about their right to file a formal complaint with the School Board in a
              timely manner;

      d.      information about their right to file a formal complaint with the Office of Civil Rights in a timely manner;

      e.      provide a psychological assessment to address the impact of the harassment on B.W.;

      f.      information about school-based counseling services for B.W.;

      g.      the ability to pay or reimburse the family for community-based counseling services;

      h.      the offer or provision of an aide or shadow to observe B.W. at school;

      i.      the offer to implement any other appropriate safety measures so as to prevent future bullying and otherwise provide a safe environment for B.W.;

      j.      complete a confidential survey of bullying and harassment at the school;

      k.      use the incidents as a teaching moment with his classmates;

      l.      to use the incidents as a teaching moment with staff;

      m.      to convene a special auditorium programs on the issues addressed in his complaints;

      n.      to provide a specific classroom program on related issues; and

      o.      to convene a problem solving meeting or a mediation with any of the other students who harassed him.

127.    Based upon all the above, it is clear that the Austin Independent School Board failed in a number of manners and particulars as well, regarding training and supervision of staff.

128.    For instance, even though Plaintiff's parents made a number of explicit complaints, believing B.W. to be a victim of bullying and harassment because of his political beliefs, and racial stereotypes, no school staff person or official ever reported such complaints to

Fourth Amended Complaint

the School District Superintendent as required by School Board Policies and Procedures.

129.    Whatever investigations were done by School District personnel, none were completed under the very specific purview and guidelines set by the School Board for any investigation based upon complaints of political free speech, or related religion and race-based stereotypes.

130.    Upon reason and belief, the School Board never provided staff training on how to conduct an appropriate Title VI Investigation or an investigation based upon allegations of violations of constitutional rights.

131.    Even though the issue of deep cultural divide in our country our state, this city, and the Austin Independent School District is problematic, the School Board never provided staff with any specific training program on cultural issues; consequently, a student was stereotyped based upon his political belief, his race, religion or ethnicity. There is no specific training program available to staff on implicit or unconscious bias as to any of these concerns.

132.    Because of the various failures of the School Board and School District personnel to correctly deal with the allegations that B.W. was a victim of bullying and harassment, whether by other students or staff or both, because of his political beliefs and the racially based stereotypical thinking related thereto, B.W. became victim of retaliation as well.

## J.      EFFECTS ON B.W.

133.    When B.W. would pass from class to class during the day, he would move through the halls

Fourth Amended Complaint

as quickly as possible in an attempt to avoid other students who harassed him. B.W. went to the bathroom in the administrative office because it was not safe in the regular restrooms. Previously very active in class discussions, due to the derision he experienced in the classroom setting, B.W. became withdrawn. Even though B.W. had really enjoyed debate class while a freshman, he did not go back for his sophomore year. B.W. founded the Austin High School (Pickup) Truck Club, and was an object of derision for this too.

## VI.   <u>ALTERNATIVE RELIEF</u>

134. Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth. Additionally, all of the below-referenced paragraphs are incorporated by reference as if fully set forth herein.

135. Moreover, each cause of action or claim below, pursuant Federal Rules Of Civil Procedure 8(d) is pled in the alternative.

## VII. <u>STATE ACTION</u>

136. The School District, the School Board and all individuals acting in any and all capacities and in all matters, acted under color of state law when it permitted Plaintiff to be subjected to the wrongs and injuries set forth herein.

## VIII. <u>UNCONSTITUTIONAL POLICIES, PROCEDURES, PRACTICES & CUSTOMS</u>

137. During the relevant time period contemplated by this cause of action, the Austin ISD School Board had an actual practice and custom of conscious and deliberate indifference to the federal law, federal rules, directives from federal executive agencies, and their own

Fourth Amended Complaint

School Board policies and procedures in regard to the treatment of B.W. and such failures were a moving force in the injuries to B.W. for which he seeks recovery pursuant to 42 U.S.C. §1983.

## IX.   CLAIMS BASED UPON VIOLATIONS OF THE U.S. CONSTITUTION

### A.   VIOLATIONS OF THE FIRST AMENDMENT

#### 1.   FREEDOM OF SPEECH

138.   Students do not lose their first amendment rights at the schoolhouse door. B.W. has a right to express his political views in support of whichever candidate or official, whether then President Trump and the Republican Party, or another candidate or political party altogether. The School District has a duty to assure he could express such beliefs without fear of bullying, harassment, assault, or derision. The Defendant failed to do so, violating B.W.'s constitutionally protected right to free speech for which he seeks recovery pursuant to 42 U.S.C. §1983.

#### 2.   FREEDOM OF RELIGION

139.   B.W. also has a right to entertain and express his religious beliefs as a Christian. The School District has a duty to assure he could express such religious beliefs without fear of bullying, harassment, assault, or derision. Defendants failed to do so, violating B.W.'s constitutionally protected right to freely exercise his religious beliefs, for which he seeks recovery pursuant to 42 U.S.C. §1983.

#### 3.   FREEDOM TO REDRESS GRIEVANCES AND BE FREE FROM

RETALIATION

140.   B.W. also has a right, pursuant to the First Amendment of the Constitution of the United

States, to file grievances with a governmental entity. The School District failed to respond

to such grievances in a timely and appropriate manner, violating B.W.'s rights pursuant to

42 U.S.C. §1983. Additionally and in a related vein, B.W. became a victim of retaliation

because of the advocacy his parents had undertaken on his behalf, equally but separately

violating his rights to the First Amendment thereby.

## B.    B.W.'s RIGHT TO A PUBLIC EDUCATION

141.   B.W.'s parents pay taxes to the Austin Independent School District. As such he has a

cognizable property right in his education pursuant to the Constitutions of both the United

States and Texas, pursuant to Texas Constitution, art. 7.

142.   The acts and omissions of the Defendant School District in treating B.W. differently than

other students because of his race and race-based stereotypes, religious beliefs or political

beliefs, individually or in concert with each other, violated B.W.'s constitutionally

protected right to a public education for which for which he seeks recovery pursuant to 42

U.S.C. §1983.

## C.    RIGHT TO EQUAL PROTECTION

143.   The United States Constitution provides that no state shall deny any person within its

jurisdiction the equal protection of the law.

144.   The acts and omissions of the Defendant School District when B.W. became an object of

Fourth Amended Complaint

derision for making public comments about his political and religious beliefs, while other students similarly situated also made public comments about their own political and religious beliefs evidence he was treated differently than other students similarly situated because of his political, religious and their own racial stereotypes. As such, and for any and all of the mistreatment noted above, he was a victim of discrimination *as a class-of-one* as contemplated by the *Equal Protection Clause* of the Fourteenth Amendment. Accordingly, he seeks recovery pursuant to 42 U.S.C. §1983.

### D.   RIGHT TO DUE PROCESS

#### 1.   TO LIFE, LIBERTY AND THE PURSUIT OF HAPPINESS

145.   The School District violated B.W.'s rights pursuant to the Due Process Clause of Fourteenth Amendment of the Constitution of the United States for which he seeks recovery pursuant to 42 U.S.C. §1983, as such acts and omissions violated his right to life, liberty and the pursuit of happiness for the acts and omissions noted above.

146.   Specifically, the School District had a custom and practice of refusing to fulfill the requisites of their own School Board Policies and Procedures in regard to investigating allegations of race-based discrimination under Title VI, or Constitutional violations, all as noted above. This failure of procedural due process had a substantive effect on B.W.'s life, liberty and pursuit of happiness.

#### 2.   FAILURE TO SUPERVISE

147.   Based upon the acts and omissions of School District Staff noted above, B.W. has good

reason to believe the School failed to correctly supervise staff in regard to the laws, regulations and directives as noted above. Such failures, in addition and in the alternative to those noted the above, likewise rise to the level of a separate violation of the Fourteenth Amendment of the Constitution of the United States for which Plaintiff seeks recovery pursuant to 42 U.S.C. §1983.

### 3.   FAILURE TO TRAIN

148.   Based upon the acts and omissions of School District Staff noted above, B.W. has good reason to believe the School failed to correctly train staff in regard to the laws, regulations and directives as noted above. Such failures, in addition and in the alternative to those noted the above, likewise rise to the level of a separate violation of the Fourteenth Amendment of the Constitution of the United States for which Plaintiff seeks recovery pursuant to 42 U.S.C. §1983. The Board failed to assure staff was trained on how address complaints based upon political free speech, religion and racial stereotypes. The need for such training on all the above is obvious when looking at the issues facing the greater City of Austin and nation regarding these very same concerns.

### X. CLAIMS PURSUANT TO TITLE VI OF THE CIVIL RIGHTS ACTS OF 1964

149.   Title VI of the Civil Rights Act of 1964 and its implementing regulations require that each state that receives disbursements, including the state's political subdivisions, not permit the student to be a victim of discrimination based upon race, nationality or related stereotypes.

150.   Plaintiffs assert that because the Austin ISD knew that B.W. was being bullied, harassed

and physically assaulted based upon his race and race-based stereotypes and failed to keep him safe from harm, and failed to provide him an environment that was not hostile, such failures as noted above, have together and separately, contributed to violating his civil rights pursuant to Title VI.

151.   Pursuant to relevant jurisprudence on the topic, including School Board Policies and Procedures, School District personnel had a duty to investigate such concerns and refused to do so, violating his civil rights pursuant to Title VI thereby. In addition, because the School District Defendant refused to remedy the effects of the bullying and harassment directed at B.W., whatever the cause, Defendant's caused additional and ongoing injuries to B.W., violating his civil rights pursuant to Title VI thereby.

152.   Last, and pursuant to relevant jurisprudence on the topic, including federal regulations, school Board Policies and Procedures, Professional Guidelines from the Office of Civil Rights with the United States Department of Education, District personnel had a duty to assure B.W. was a not a victim of retaliation because of the advocacy undertaken on his behalf. As such, this is a separate cause of action also violating his civil rights pursuant to Title VI.

## XI.   <u>STATE LAW CLAIMS</u>

153.   B.W. alleges that the acts and omissions of the School District Defendant, violates his protected civil rights pursuant to Chapter 106 of the Texas Civil Practices & Remedies Code prohibiting discrimination because of *Race, Religion, Color, Sex, Or National Origin*

by permitting unnecessary burdens to affect him. The damages he experienced and this violation may be remedied pursuant to Chapter 104 of the Texas Civil Practices & Remedies Code.

154.    Additionally, B.W. alleges that the acts and omissions of the School District Defendant, violates his protected civil rights pursuant to Chapter 110 of the Texas Civil Practices & Remedies Code prohibiting discrimination because of *Religion.* He may be reimbursed for damages he experienced at the hands of the Defendant. Moreover, he may recover reasonable attorney's fees and costs.

## XII.   RATIFICATION

155.    The Austin ISD School Board ratified the acts, omissions and customs of school district personnel and staff.

156.    As a result, the Austin ISD Defendant is responsible for the acts and omissions of staff persons noted above.

## XIII.   PROXIMATE CAUSE

157.    Each and every, all and singular of the foregoing acts and omissions, on the part of the School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XIV.   DAMAGES

158.    As a direct and proximate result of the School District's conduct, B.W. has suffered injuries and damages, for which she is entitled to recover herein including but not limited to:

Fourth Amended Complaint

a.      Stigma;

b.      Loss of educational opportunities;

c.      Physical pain in the past;

d.      Medical expenses in the past;

e.      Mental anguish in the past;

f.      Mental anguish in the future;

g.      Physical impairment in the past,

h.      Reimbursement of past and future taxes collected by the Austin Independent School

        District that B.W. cannot benefit from;

i.      Damages, including nominal damages; and

j.      Various out-of-pocket expenses incurred by his family but for the acts and

        omissions of the School District.

## XV. <u>ATTORNEY FEES</u>

159.    It was necessary for B.W. to retain the undersigned attorneys to file this lawsuit. Upon

        judgment, he is entitled to an award of attorney fees and costs pursuant to Title VI, 42

        U.S.C. §2000d *et seq.*, 42 U.S.C. §1988, and Chapter 110 of the Texas Civil Practices &

        Remedies Code.

## XVI. <u>SPOLIATION</u>

160.    Plaintiff hereby requires and demands that Austin ISD preserve and maintain all evidence

        pertaining to any claim or defense related to the assault or other violations that make the

Fourth Amended Complaint

basis of the complaint and the damages resulting therefrom, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence regarding the violations set forth herein.

161.   Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule- an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

## XVII.   EQUITABLE RELIEF

162.   Because of the failures of the School District Defendant to have practices and customs that comport with the jurisprudence related to violations of law expressed above, the Court should order an independent monitor to complete an internal audit of the Austin Independent School District and School Board on these issues. The Court should also order Defendants to undergo training and instruction on students' constitutional rights.

## XVIII. DEMAND FOR JURY TRIAL

163.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all issues in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays for judgment against the District in the manner and particulars noted herein, in an amount sufficient to fully compensate him for the elements of damages noted herein, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action and for its appeal if required, together with pre- and post- judgment interest and court costs expended in this cause, and for such other relief as the Court, in law or in equity or as to both, deems just and proper.

Respectfully submitted,
/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
State Bar No.: 00783829
Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas    78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]
Lead Counsel

Ms. Kristina Denapolis West,
Attorney & Counselor At Law
State Bar. No. 24062697
Center for American Liberty
5100 Buckeystown, Suite 250
Frederick, Maryland 21704
(703) 687-6200 [Telephone]
KDWest@libertycenter.org [Email]
*Pro Hac Vice*

**ATTORNEYS FOR PLAINTIFF**

Fourth Amended Complaint

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2021 I electronically filed the foregoing documents with the Clerk of Court using the CM/ECF system and notice was electronically provided to the following CM/ECF system participants.

Mr. Christopher B. Gilbert, Attorney & Counselor At Law
State Bar. No. 00787535
So. Dist. No. 17283
cgilbert@thompsonhorton.com [Email]
Thompson & Horton LLP
3200 Southwest Freeway
Suite 2000
Houston, TX 77027
(713) 554-6744 [Telephone]
(713) 583-7698 [Facsimile]
**ATTORNEY FOR AISD**

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.